## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------x

In re

PFF Bancorp, Inc., *et al.*,[1]

        Debtors.

-----------------------------------------------------------x

   : Chapter 11

   : Case No. 08-13127 (KJC)
   : (Jointly Administered)

   : **Hearing Date: 11/22/10 @ 4:30 pm EST (requested)**
   : **Objection Deadline: 11/17/10 @ 4:00 pm EST (requested)**

## MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR APPROVAL OF SETTLEMENT AGREEMENT BETWEEN THE DEBTORS, THE FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR PFF BANK & TRUST AND THE FEDERAL DEPOSIT INSURANCE CORPORATION IN ITS CORPORATE CAPACITY

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

hereby submit this motion (the "Motion") pursuant to section 105(a) of title 11 of the United

States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") for approval of that certain settlement agreement (the

"Settlement Agreement") between the Debtors, the Federal Deposit Insurance Corporate in its

corporate capacity (the "FDIC-C") and the Federal Deposit Insurance Corporation as receiver for

PFF Bank & Trust (the "FDIC-R"), a copy of which is attached hereto as Exhibit B, and in

support therefore, the Debtors respectfully state as follows:

---

[1] The Debtors are the following 5 entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): PFF Bancorp, Inc., a Delaware corporation (1623), Glencrest Investment Advisors, Inc., a Delaware corporation (1405), Diversified Builder Services, Inc., a California corporation (4416), PFF Real Estate Services, Inc., a California corporation (0728) and Glencrest Insurance Services, Inc., a California corporation (3118). The mailing address of each of the Debtors is 2058 N. Mills Ave, #139, Claremont, California 91711.

## Jurisdiction and Venue

1.     The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

## Background

### A.     General

2.     PFF Bancorp, Inc. ("Bancorp"), formerly a non-diversified unitary savings and loan holding company within the meaning of the Home Owners' Loan Act, is incorporated in the State of Delaware with headquarters formerly located at 9337 Milliken Avenue, Rancho Cucamonga, California 91730.  Bancorp is the direct parent or the 100% equity owner of each of the remaining Debtors.

3.     Prior to the December 5, 2008 petition date (the "Petition Date"), Bancorp was also the direct parent of PFF Bank & Trust ("PFF Bank"), a federally chartered savings institution, and such bank's subsidiaries, including Pomona Financial Services, Inc. and Diversified Services, Inc.  Bancorp conducted its business primarily through PFF Bank.

4.     On November 21, 2008, the Office of Thrift Supervision, by order number 08-057, closed PFF Bank & Trust, and appointed the FDIC-R.  As of the same date, the FDIC-R and the FDIC-C entered into a Purchase and Assumption Agreement Whole Bank All Deposits with US Bank, N.A. dated as of November 21, 2008 (the "P&A Agreement") under which US Bank purchased certain assets and assumed certain liabilities of PFF Bank.

5.     On December 5, 2008, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the above-captioned cases.  The Debtors are continuing to operate their businesses as debtors and debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.  No trustee has been appointed in these cases.  On December 17, 2008, the

2

Office of the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee").

6.      On June 4, 2009, the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") entered the Order Granting Motion of Debtors and Debtors-in-Possession for Entry of an Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form, Manner and Sufficiency of Notice Thereof [Docket No. 249] (the "Bar Date Order"). Pursuant to the Bar Date Order, the last day for filing proofs of prepetition claims against the Debtors was fixed as July 21, 2009 at 5:00 p.m., prevailing Eastern Time (the "Bar Date"), for both general claims and claims of governmental units.

7.      In accordance with the Bar Date Order, on July 20, 2009, the FDIC-R filed proof of claim number 54 (the "FDIC-R Proof of Claim"). In the FDIC-R Proof of Claim, the FDIC-R asserted a variety of claims, including contingent and unliquidated claims, against the Debtors. The claims asserted included: "claims arising from consolidated tax returns filed by PFF Bancorp on behalf of, among others, PFF Bank and for tax related intercompany balances to the extent they are held by PFF Bancorp as agent for PFF Bank under applicable law"; claims to enforce under section 365(o) of the Bankruptcy Code any prepetition commitment made by PFF Bancorp to federal banking regulators to maintain the capital of PFF Bank; claims for recovery of unlawful dividends or distributions from PFF Bank that were caused or procured by PFF Bancorp or the other Debtors including for recovery of dividends from PFF Bank to PFF Bancorp of $20 million for the quarter ended March 31, 2007 and of $4 million for the quarter ended June 30, 2007; claims for recovery of insurance proceeds to the extent payments for covered loss suffered by PFF Bank under applicable insurance policies might be paid to the Debtors; claims for other matters to the extent arising under the P&A Agreement; and other

3

unliquidated claims, including claims arising from harm caused to PFF Bank, including by "directing and/or authorizing the various upstream dividend and other avoidable transfers, failing to adequately maintain PFF Bank's capital or liquidity, failing to establish or maintain adequate internal controls, failing to engage in suitable risk management, implementing substandard practices for loan underwriting and asset purchases and sales for PFF Bank and otherwise taking or omitting to take actions that would serve PFF Bank's interests."

8.     The FDIC-R Proof of Claim also included the following express reservation of the FDIC-Receiver's jurisdictional defenses:

> The FDIC-Receiver is entitled to the statutory protections provided under its governing statute, including without limitation 12 U.S.C. § 1821(d)(13)(D) and the exclusive receivership claims process set forth in 12 U.S.C. § 1821(d). This proof of claim is filed solely to protect the FDIC-Receiver against a claim of waiver in the Debtors' bankruptcy cases and does not alter or waive the foregoing statutory provisions in any respect. To the extent that the Debtors have claims seeking payment from PFF Bank or the FDIC-Receiver, seeking to determine rights with respect to the assets of PFF Bank or relating to acts or omissions of PFF Bank or the FDIC-Receiver as its receiver, those claims were required to be asserted in a proof of claim against the FDIC-Receiver by no later than the receivership claims bar date. To the extent not asserted by that date, such claims are barred. Further, the only litigation permitted with respect to such matters is as provided under 12 U.S.C. § 1821(d).

9.     No objection has been filed to date as to any aspect of the FDIC-R Proof of Claim. The deadline for the Debtors to object to the FDIC-R Proof of Claim has not expired.

10.     On June 4, 2009, Bancorp filed a receivership proof of claim with the FDIC-R (the "Receivership Claim") asserting certain claims against the FDIC-R and FDIC-C. In a letter dated March 31, 2010, the FDIC-R disallowed the Receivership Claim in substantial part, but stated that a receivership certificate was issued in the amount of $99,000.00 to Glencrest Investment Advisors, one of the Debtors, with respect to its claim for advisory fees. On May 28, 2010, Bancorp filed an action against the FDIC-R and the FDIC-C in the United States District

LEGAL_US_E # 90463238.6
RLF1 3628544v. 1

Court for the Central District of California (the "District Court Action") seeking a judicial determination of its disallowed receivership claim under 12 U.S.C. § 1821(d)(6), and asserting certain other claims against the FDIC-R and the FDIC-C. Under a schedule approved by the district court in that action, the responses of the FDIC-R and FDIC-C to the Debtors' complaint in the District Court Action are due on or before January 4, 2011.

**B.      Tax Refunds and Returns**

11.      Historically, the Debtors, along with PFF Bank & Trust and the bank's non-debtor subsidiaries (collectively, "PFF Bank" and together with the Debtors, the "Consolidated Group"), filed consolidated tax returns with the Internal Revenue Service ("IRS") and other tax authorities. The common parent, Bancorp, acted as the agent for all members of the affiliated group in filing the consolidated tax returns. See 26 C.F.R. ("Treas. Reg.") §§1.1502-77(a)(1), (c).

12.      For the tax year ended March 31, 2008, members of the Consolidated Group reported a net operating loss for federal income tax purposes. Pursuant to Title 26 of the U.S. Code, the Internal Revenue Code ("IRC") § 172(b)(1)(A) the Consolidated Group filed a claim for refund that carried back the loss generated in the year ended March 31, 2008 to offset taxable income reported in the two preceding tax years. The IRS reviewed this filing and paid a tax refund of $59,003,516 to the Consolidated Group.

13.      Members of the Consolidated Group also reported a net operating loss for federal income tax purposes for the year ended March 31, 2009. The Consolidated Group did not seek to carryback that loss to the immediately preceding two years since at that time, all potential refunds for those years had been received.

14.      However, in November 2009 as part of the Worker, Homeownership, and Business Assistance Act of 2009, the IRC was amended to add 26 U.S.C. § 172(b)(1)(H), which

5

allows taxpayers to extend the carryback period for a loss sustained in either 2008 or 2009, but not both, for up to five tax years. As a result, additional federal tax refunds are available to the Consolidated Group, subject to making the necessary filings with the IRS. The Debtors believe the IRS may view December 15, 2010, as the deadline for members of the Consolidated Group to make the filings required under IRC § 172(b)(1)(H) to elect the loss year for the five-year carryback.

15.     Although the Debtors and the FDIC-R agree that amended returns and/or claims for refund should be filed, to among other things, claim the refund made available as a result of this recent amendment to the IRC, the parties have disagreements regarding their respective entitlement to tax refunds that may be recoverable from federal, state or local tax authorities, the manner and means by which such tax refunds might be claimed by the Debtors or the FDIC-R, and the effect that provisions of the tax allocation agreement entered into in 2003 (the "PFF Tax Allocation Agreement") might have on these disputes.

## The Settlement Agreement

16.     The compromise set forth in the Settlement Agreement provides for the resolution of (i) the FDIC-R's and the Debtors' claims to ownership of the tax refunds, (ii) all claims asserted by the FDIC-R against the Debtors and (iii) all claims asserted by the Debtors against FDIC-R or FDIC-C. The salient terms of the Settlement Agreement are as follows:[2]

- The Debtors and the FDIC-R will cooperate to maximize the amount of tax refunds, minimize the amount of any tax deficiencies and obtain the payment of tax refunds as quickly as possible;

---

[2] To the extent that the summarized terms provided herein conflict with the terms of the Settlement Agreement, the terms of the Settlement Agreement shall govern.

- The Consolidated Group will elect the tax year ended March 31, 2008 as the applicable year for purposes of the five-year NOL carryback allowed by the amendment to IRC §172(b)(1)H) (the "2008 Five-Year NOL Carryback");

- The Consolidated Group will carry back the net operating loss reported for the year ended March 31, 2009 for the two-year period allowed under the IRC (the "2009 Two-Year NOL Carryback");

- The parties anticipate that the aggregate amount of the federal tax refunds arising from the 2008 Five-Year NOL Carryback plus the 2009 Two-Year NOL Carryback will be $44,591,902.00, plus interest (together, the "NOL Refunds");

- The FDIC-R shall be the owner of $26,000,000.00, plus allocable interest, from the NOL Refunds, and the Debtors shall be the owner of $18,591.902.00, plus allocable interest, from the NOL Refunds;

- If the total amount of tax refunds recovered from the IRS with respect to the NOL Refunds is less than $44,591,902.00 the amounts recovered by the FDIC-R and the Debtors shall be reduced ratably;

- There is a pending claim for refund arising from the tax year ended March 31, 2005 (the "Pending 2005 Refund"), in the amount of $770,571.23, plus interest, if applicable, arising from an amended federal return for that tax year that was filed on or around October 23, 2008. FDIC-R shall be the owner of 85% of the Pending 2005 Refund and the Debtors shall be the owner of 15% of the Pending 2005 Refund.

- Certain additional federal tax refunds may be generated because of the 2008 Five-Year NOL Carryback in excess of $44,591,902.00, but not including the Pending 2005 Refund (the "Additional Refunds"). The ownership of the Additional Refunds shall be divided among the parties as follows:

  i. With respect to the first $3 million of Additional Refunds, if any, paid by the IRS, the Debtors shall be the owners of 2/3 of such amounts and the FDIC-R shall be the owner of 1/3 of such amounts.

  ii. With respect to the next $2 million of Additional Refunds, if any, paid by the IRS, the Debtors shall be the owners of 1/2 of such amounts and the FDIC-R shall be the owner of 1/2 of such amounts.

  iii. The FDIC-R shall be the owner of all Additional Refunds paid by the IRS to the extent such payments exceed $5 million.

- Upon the effective date of the Settlement Agreement, the District Court Action will be dismissed.

LEGAL_US_E # 90463238.6
RLF1 3628544v. 1

- Except as provided in Section 3.02(b) or Section 3.05 of the Settlement Agreement, upon the Effective Date, the FDIC-R and FDIC-C each shall be deemed to have released, waived and discharged any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities, whether for tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that either one of them have or may have had, (i) against the Debtors (as they existed prior to or after the filing of their bankruptcy cases), or any one of them, or their respective bankruptcy estates, or their predecessors, successors or assigns, that were or could have been asserted in the FDIC-R Proof of Claim or in any other claim, action or proceeding, and (ii) against the current officers, directors and professionals of the Debtors solely to the extent arising from or concerning the negotiation and execution of this Agreement and proceedings seeking Bankruptcy Court approval thereof.

- Nothing in the Settlement Agreement shall release any claim that the FDIC-R or FDIC-C has or may have arising under the Settlement Agreement, nor shall any provision of the Settlement Agreement affect the rights of the FDIC-R or FDIC-C to intervene in and defend any action brought by or on behalf of any of the Debtors against any third party concerning matters that are the subject of the Purchase and Assumption Agreement, Whole Bank, dated as of November 21, 2008 among the FDIC-R, FDIC-C and U.S. Bank National Association.

- Except as provided in Section 3.03(b) or Section 3.05 of the Settlement Agreement, upon the Effective Date, each of the Debtors, for itself and for its respective predecessors, successors, creditors, stockholders, and assigns, shall be deemed to have released, waived and discharged any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities, whether for tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that either one of them has or may have had, against the FDIC-R or FDIC-C, or their predecessors, successors or assigns, that were or could have been asserted in the District Court Action, the Receivership Claim, or in any other claim, action or proceeding.

- Nothing in the Settlement Agreement shall release any claim that any Debtor has or may have arising under the Settlement Agreement, nor shall any provision of the Settlement Agreement affect the receivership certificate that was issued by the FDIC-R to Glencrest Investment Advisors, Inc. in the amount of $99,000.00.

- The Debtors, the FDIC-R and FDIC-C shall each retain their respective claims or causes of action against present or former directors, officers, employees, professionals or third party advisors of the Debtors, PFF Bank or their respective subsidiaries, or any person or entity other than the borrower potentially liable for mortgage fraud to PFF Bank, based on, arising from or concerning any act taken,

or fact in existence, on or before the Petition Date (even if damages arose from such acts or facts in existence after the Petition Date). Nothing in the Settlement Agreement shall release any of the current or former officers, directors, employees, professionals or third party advisors of any of the Debtors, of PFF Bank or of their respective subsidiaries, or any person or entity other than the borrower potentially liable for mortgage fraud to PFF Bank, from any such claim or action, provided that the Debtors shall not be precluded from including in any plan of liquidation or reorganization proposed in these chapter 11 cases a release of their current officers and directors solely for acts taken on or after the Petition Date.

• FDIC-C shall retain any claim or cause of action that may exist against any of the Debtors or their directors and officers arising under section 8 of the Federal Deposit Insurance Act, 12 U.S.C. § 1818, or regulations of any Federal bank regulatory agency promulgated thereunder, provided that nothing in this Agreement shall modify the Order Granting Motion of Debtors and Debtors-in-Possession for Entry of an Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form, Manner and Sufficiency of Notice Thereof entered in the Debtors' chapter 11 cases [Docket No. 249] to the extent that Order may be applicable.

• Nothing in the Settlement Agreement shall affect the FDIC-R's or FDIC-C's right to intervene in, and assert its ownership with respect to, any claim or action asserted by or on behalf of any of the Debtors against any director, officer, employee, professional, third party advisor, or any person or entity other than the borrower potentially liable for mortgage fraud to PFF Bank (or by or against any insurer with respect to any such claim or action), that the FDIC-R or FDIC-C, as the case may be, determines, in its sole discretion, to be based on alleged harm to PFF Bank or its subsidiaries.

• Nothing set forth in the Settlement Agreement shall be deemed to be an agreement to extend the deadline set forth in the Bar Date Order for filing prepetition proofs of claim against the Debtors.

• Except for the provisions of Section 2.01, Section 2.02 and Section 2.03 (which shall become effective immediately upon the execution of the Settlement Agreement by all parties), the provisions of the Settlement Agreement are subject to prior satisfaction of the following conditions:

a. The execution and delivery of the Settlement Agreement by a duly authorized signatory on behalf of each party.

b. Approval of the Settlement Agreement and the settlement by the Board of Directors of the Federal Deposit Insurance Corporation (the "FDIC Board"), provided that the FDIC-R and FDIC-C may determine in their sole discretion that this condition can be satisfied by approval of the Settlement Agreement and the settlement by a person other than the FDIC

9

Board exercising appropriate delegated authority on behalf of the Federal Deposit Insurance Corporation.

c.   Entry of an order by the Bankruptcy Court approving the Agreement and the Settlement pursuant to Bankruptcy Rule 9019 (an "<u>Approval Order</u>") and such order having become a Final Order.

## Relief Requested

17.   By this Motion, the Debtors respectfully request entry of an order pursuant to 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019(a) approving the Settlement Agreement in accordance with its terms.

## Basis for Relief

18.   Section 105 of the Bankruptcy Code provides, in pertinent part, that the "[c]ourt may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a). Bankruptcy Rule 9019 governs the procedural prerequisites to approval of a settlement agreement and provides, in relevant part, that "[o]n motion by the [debtor-in-possession] and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). Together, section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019(a) empower a bankruptcy court to approve a proposed compromise and settlement when it is in the best interests of the debtor's estate and its creditors. See <u>In re Marvel Entm't Group, Inc.</u>, 222 B.R. 243, 249 (D. Del. 1998); <u>In re Louise's Inc.</u>, 211 B.R. 798, 801 (D. Del. 1997); <u>Vaughn v. Drexel Burnham Lambert Group (In re Drexel Burnham Lambert Group)</u>, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); <u>In re Texaco</u>, 84 B.R. 893, 901-02 (Bankr. S.D.N.Y. 1988).

19.   "[C]ompromises are favored in bankruptcy" because they minimize litigation costs and further the parties' interest in expediting administration of a bankruptcy estate. <u>Myers v. Martin (In re Martin)</u>, 91 F.3d 389, 393 (3rd Cir. 1996) (citing 9 COLLIER ON BANKRUPTCY

LEGAL_US_E # 90463238.6
RLF1 3628544v. 1

¶ 9019.03[1] (15th ed. 1993)). Thus, a court should approve a settlement agreement if the proposed agreement does not "fall beneath the lowest point in the range of reasonableness." In re Coram Healthcare Corp., 315 B.R. 321, 330 (Bankr. D. Del. 2004) (quoting Official Unsecured Creditors' Comm. v. Pennsylvania Truck Lines, Inc. (In re Pennsylvania Truck Lines), 150 B.R. 595, 598 (E.D. Pa. 1992)); In re Drexel Burnham, 134 B.R. at 5050.

20.     The Third Circuit has identified four factors to be utilized in determining whether a settlement falls within the range of reasonableness:

> 1)     the probability of success in the litigation;
> 2)     difficulties to be encountered in collection;
> 3)     the complexity of the litigation and related expense, inconvenience, and delay; and
> 4)     the interests of the creditors.

Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3rd Cir. 2002); In re Etoys, Inc., 331 B.R. 176, 198 (Bankr. D. Del. 2005); In re Coram Healthcare Corp., 315 B.R. at 330-31; see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968).

21.     A court need not decide the numerous issues of law and fact raised by the settlement, but rather should canvass the issues and see whether the settlement "fall[s] below the lowest point in the range of reasonableness." Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983) (quoting Newman v. Stein, 464 F.2d 689, 693 (2d Cir. 1972); see also In re World Health Alternatives, Inc., 344 B.R. 291, 296 (Bankr. D. Del. 2006); In re Key3Media Group, Inc., 336 B.R. 87, 92-93 (Bankr. D. Del. 2005).

22.     Furthermore, "[t]here is no per se rule that the views of a committee or other creditors are dispositive on the reasonableness of a settlement" as such a rule "would unduly expose the Debtors to the demands of creditors preferring to risk estate assets in a litigation lottery or litigate under blackmail or strong-arm strategies." In re Capmark Financial Group Inc.,

11

Case No. 09-13864, at *90 (CSS) (Bankr. D. Del. Nov. 1, 2010). Indeed, "a debtor may seek approval of a settlement over major creditor objections as long as it carries its burden of establishing that the balance of the . . . factors, including the paramount interests of creditors, weighs in favor of settlement." Id. (citing In re Key3Media Grp., Inc., 336 B.R. at 97).

23. Applying the above factors to the present case, the Settlement Agreement is in the best interest of the Debtors' estates.

## Avoidance of Complex and Uncertain Litigation with the FDIC

24. Approval of the Settlement Agreement will eliminate substantial litigation risk for the Debtors and their creditor constituencies, will result in the recovery by the Debtors' estates of significant federal tax refunds and will enable the Debtors to avoid the expense and delay that would result from litigation of various highly complex and contentious tax related disputes with the FDIC-R. In addition, the Settlement Agreement would resolve the other claims asserted by the FDIC-R in its proof of claim, including claims that could result in substantial priority claims, and would resolve the claims that have been asserted by the Debtors against the FDIC-R and FDIC-C in the District Court Action.

### A.    Tax Refunds

25. The Settlement Agreement would resolve complex disputes between the Debtors and the FDIC-R both as to the ownership of federal tax refunds that may be recovered by the Consolidated Group and as to the possibility of competing returns and claims for refunds, which could substantially delay the recovery of any refunds.

26. Under IRS regulations, the common parent corporation of an affiliated group for a consolidated return year acts as the agent for members of the affiliated group as a convenience to the IRS. Treas. Reg. §§1.1502-77(a)(1), (c). In the case of a failed depository institution, however, the Internal Revenue Code and the regulations promulgated thereunder allow the FDIC

12

as receiver to also act as an agent and file its own loss year returns and claims for refunds on behalf of a consolidated group that includes the failed institution. Treas. Reg. § 301.6402-7; see also 26 U.S.C. § 6402(k).

27. In the course of discussions between counsel for the Debtors and counsel for the FDIC-R, it has become apparent that those parties might take different views about the appropriate election to make for the five-year carryback made available under IRC § 172(b)(1)(H). In the absence of a settlement, the Debtors understand that it would have been the intention of the FDIC-R to seek an order from this Court confirming that the automatic stay did not prohibit it from making filings with the IRS allowed under the provisions cited above, including making an election to use the tax year ended March 31, 2009 for the five-year carryback election rather than the tax year ended March 31, 2008 that the Debtors intend to elect, or obtaining an order modifying the automatic stay to allow the FDIC-R to make such filings.

28. The Debtors believe that the FDIC-R would likely file a motion seeking a declaration that the automatic stay does not apply or, in the alternative, would seek relief from the automatic stay. See e.g., Advanta Bank Corp. v. Advanta Corp. (In re Advanta Corp.), Case No. 10-50795 (Bankr. D. Del.). Whether the stay must be lifted is beside the point. Absent the Settlement Agreement, the parties would still litigate the issue which would have resulted in additional administrative expense for the Debtors' estates.

29. If there were no settlement between the FDIC and the Debtors and if the FDIC were successful in filing a return pursuant to Treas. Reg. § 301.6402-7, there is uncertainty as to how the IRS would treat that competing return which may lead to additional expenditures and delay. The IRS would have one return that claimed a five-year NOL carryback for the year

LEGAL_US_E # 90463238.6
RLF1 3628544v. 1

ended March 31, 2008 and another return claiming the five-year NOL carryback for the year ended March 31, 2009. Only one election is possible. See 26 U.S.C. § 172(b)(1)(H)(3)(i).

30.     The IRS published guidance in this area leads the Debtors to believe that the filing of two competing tax returns and claims for refunds asserting the five-year NOL carryback for two different tax years would likely delay the issuance of any refund by the IRS. See Field Service Advice 200051002, (September 15, 2000). Instead, the Debtors believe that in those circumstances they would likely be required to pursue an action against the IRS under section 505 of the Bankruptcy Code to determine "the amount or legality of any tax." See 11 U.S.C. § 505(a).

31.     Consequently, in the absence of the Settlement Agreement, the Debtors would be forced to file an adversary proceeding in the Bankruptcy Court to determine the amount and ownership of the tax refunds. The Debtors believe that the FDIC-R would assert its jurisdictional arguments, and could be expected to argue in response to such a filing that this Court lacks subject matter jurisdiction to determine such a dispute, which must be resolved through the exclusive receivership claims process. See 12 U.S.C. § 1821(d)(13)(D). In addition, the FDIC-R would likely seek to withdraw the reference of the adversary proceeding pursuant to 28 U.S.C. § 157(d) and Bankruptcy Rule 5011. See e.g., Corus Bankshares, Inc. v. Federal Deposit Ins. Corp., Case No. 1:10-cv-05654 (N.D. Ill.) (motion pending). Whether the FDIC would prevail in such an action is not free from doubt. The Debtors, however, would be forced to incur more expense and the delay to creditors would be increased.

32.     The litigation that would ensue absent the Settlement Agreement would not be limited to the procedural issues discussed above. There are many complex and uncertain factual and legal interpretation issues that would have to be litigated by the Debtors in the absence of the

14

Settlement Agreement. As set forth below, these issues would not only take a significant amount of time to litigate, the outcome of such litigation is far from certain.

33. The first substantive issue is whether the tax refunds allocable to PFF Bank are property of the Debtors' bankruptcy estate or whether the refunds pass to PFF Bank outside of the bankruptcy estate. The general rule is that absent an agreement (a "Tax Allocation Agreement") regarding the sharing of tax refunds received by a parent entity on behalf of a consolidated group, the parent entity holds such refund in trust for each member of the consolidated group. See Bob Richards Chrysler-Plymouth Corp., Inc., 473 F.2d 262 (9th Cir. 1973). Thus, any portion of a tax refund relating to non-debtor entities is not property of the debtors' estates. Id.

34. However, when the members of a consolidated group have entered into a Tax Allocation Agreement there is a split of authority as to whether the tax refund allocable to a non-bankrupt entity is property of the estate. For example, in BSD Bancorp. Inc. v. FDIC, Case No. 93-12207-A11 (S.D.Cal.1995) the district court found that the economic reality encompassed in tax allocation agreement was that the parent corporation held the tax refund in trust for the subsidiary entity.

35. In contrast, the courts in In re First Cent. Financial Corp., 269 B.R. 481 (Bankr. E.D.N.Y. 2001) aff'd 377 F.3d 209 (2d. Cir. 2004), In re Franklin Savings Corp., 159 B.R. 9 (Bankr. D. Kan. 1993) aff'd 182 B.R. 859 (D.Kan. 1995), and In re Team Financial, Inc., 2010 WL 1730681 (Bankr. D. Kan. 2010) found that a tax allocation agreement created a debtor-creditor relationship between the parent and subsidiaries with regard to the tax refunds.

36. The Debtors believe that the weight of the authority is on the side of finding a debtor-creditor relationship, however, there are a number of additional hazards that the Debtors

LEGAL_US_E # 90463238.6
RLF1 3628544v. 1

must take into account.  The primary hazard is that terms of the PFF Tax Allocation Agreement specifically adopts the FDIC's Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure.  Specifically, the PFF Tax  Allocation Agreement ¶10 provides:

> It is the intent of this [PFF Tax Allocation Agreement] to comply with the Interagency Statement on Income Tax Allocation in a Holding Company structure dated November 23, 1998 (the "Policy Statement").  To the extent that anything herein conflicts with the Policy Statement, such Policy Statement shall govern.

Emphasis added.

37.　　The Policy Statement contains language that could support an interpretation that the tax refunds are not property of the parent in a consolidated group.  In relevant part, it states:

> Regardless of the treatment of an institution's tax loss for regulatory reporting and supervisory purposes, a parent company that receives a tax refund from a taxing authority obtains these funds as agent for the consolidated group on behalf of the group members.  Accordingly, an organization's tax allocation agreement or other corporate policies should not purport to characterize refunds attributable to a subsidiary depository institution that the parent receives from a taxing authority as the property of the parent.

Emphasis added (footnote omitted).  If the parent cannot characterize the tax refund as property of the parent it is more difficult to argue that it should be property of the parent's bankruptcy estate.  Further, the Debtors understand that the FDIC-R would argue in the case of affiliated groups in which the parent is a bank holding company, it is a violation of federal banking law for a tax allocation agreement to alter the outcome provided for under Bob Richards, which the FDIC-R contends is the common-law result.[3]  The FDIC-R would reason, based upon the above

---

[3]　　In fact, the FDIC-R takes a different view from the Debtors in this area of the law. The FDIC-R would argue that under federal law, a parent corporation that receives refunds on behalf of the members of an affiliated group does not own such refunds but instead holds them in trust for the members of the group whose earnings and loss history are responsible for the refunds, unless there is an express agreement altering this rule. Further, the FDIC-R asserts it is a violation of federal banking law for a tax allocation agreement to alter this outcome.  As a result, no tax allocation agreement can alter the common law rule

LEGAL_US_E # 90463238.6
RLF1 3628544v. 1

quoted language in the Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure, 63 Fed. Reg. 64757 (Nov. 23, 1998), that a tax allocation agreement that violated this and other banking law principles would be deemed by federal bank regulators to constitute an "unsafe and unsound banking practice" that would subject the holding company to supervisory action.

38.     At the same time there is language in the Policy Statement that would support an interpretation that a debtor-creditor relationship exists between the parent and the subsidiary entities.  In pertinent part, the Policy Statement provides:

> If a refund is not made to the institution within this period, the institution's primary federal regulator may consider the receivable as either an extension of credit or a dividend from the subsidiary to the parent.  A parent company may reimburse an institution more than the refund amount it is due on a separate entity basis.

Emphasis added.  The use of the words "receivable" to describe the tax refund is not indicative of property that has been set aside for the benefit of the subsidiary entity, but rather it is evidence of a debtor-creditor relationship.

39.     No Court has addressed this apparent inconsistency in the Policy Statement. Rather the bankruptcy courts to address the policy statement have dismissed its importance.  See Zucker v. FDIC (In re Netbank, Inc.), Case No. 08-A.P.-00346 (Bankr.M.D. Fla. 2010)("the Policy Statement does not constitute a rule or regulation or have the force of law . . . ."); In re Team Financial, Inc., 2010 WL 1730681, *9 (Bankr. D. Kan. 2010) ("Not even the FDIC asserts that this policy statement has the force of law.")  The FDIC has taken appeals in both of those cases, and in any event, unlike Netbank and Team Financial, the PFF Tax Allocation Agreement

---

(continued...)

without violating federal banking law.  Thus, the Debtors expect the FDIC-R would assert that the PFF Tax Allocation Agreement must be interpreted in such a fashion so as not to violate federal banking law.

17

expressly incorporates the Policy Statement by reference. Because no court has confronted this issue, additional uncertainty exists for the Debtors.

40.     A further argument that the FDIC may raise is that federal banking law may prohibit a debtor-creditor relationship between a parent entity and its subsidiary bank. In particular, the Debtors expect the FDIC to assert that 12 U.S.C. § 371c prohibits a bank from making loans to their affiliates and if such a loan were made, it would be considered a "safety and soundness" issue that could subject the bank to closure by its governing regulator. While this issue has been briefed in both the Netbank, and Team Financial Inc. bankruptcies there has been no final resolution to this issue in either case. Thus, this settlement vitiates the need to litigate this undeveloped area of the law.

41.     Put simply, there are sufficient hazards of litigation to the Debtors in the determination of whether the tax refund allocable to PFF Bank should be property of the bankruptcy estate or whether the tax refund passes to PFF Bank outside of bankruptcy.

42.     The second substantive issue regarding the tax refund is the amount of the refund allocable to PFF Bank. The Debtors and the FDIC-R disagree as to the amount of the tax refund allocable to PFF Bank. The PFF Tax Allocation Agreement ¶6 provides:

> If the consolidated tax liability is adjusted for any taxable period, whether by means of an amended return, claim for refund or after a tax audit by the Internal Revenue Service, the liability of each Member shall be recomputed to give effect to such adjustments, and in the case of a refund . . . . In no event shall the Bank or Bank Subsidiaries receive less nor pay more than if they had filed a tax return on a separate basis.

43.     As set forth above, the Debtors intend to file a claim for refund for the tax year ended March 31, 2008 to carry back the net operating loss for the year ended March 31, 2008 for a five-year period. The Debtors contend that under this tax return filing, that PFF Bank is only entitled to a tax refund of approximately $17 million.

LEGAL_US_E # 90463238.6
RLF1 3628544v. 1

44.     The FDIC-R points out that if the five-year carryback election were based on the tax year ended March 31, 2009 instead of the tax year ended March 31, 2008, the share of the resulting federal tax refund allocable to PFF Bank would be approximately $34 million while the Debtors' share would be only $3 million. The FDIC-R argues that it is entitled to ownership of $34 million in refunds even if the Consolidated Group elects to file a five-year carryback election based on the tax year ended Mach 31, 2008 because (i) if it filed its own tax return on behalf of the Consolidated Group it could elect its own loss year for carryback purposes; and (ii) language in the PFF Tax Allocation Agreement provides that "[i]n no event shall the Bank or Bank Subsidiaries receive less nor pay more than if they had filed a tax return on a separate basis."

45.     The Debtors disagree. The Debtors contend that paragraph 9 of the PFF Tax Allocation Agreement controls. In relevant part, it provides:

> In its sole discretion, the [PFF Bancorp Inc.] shall have the right with respect to any Consolidated Returns which it has filed or will file [] to determine . . . the elections that will be made by any Member . . . .

However, there is a dearth of caselaw in this area and no certainty as to how a Court might deal with the interpretation of this type of conflicting language in a tax allocation agreement.

**B.     Proof of Claim and District Court Litigation**

46.     The Settlement Agreement also allows the Debtors to avoid litigation related to other claims asserted in the FDIC Proof of Claim. As discussed at the beginning of this motion, the FDIC Proof of Claim asserted numerous claims against the Debtors including certain unliquidated priority claims under section 507(a)(9) of the Bankruptcy Code.

47.     Under section 365(o) of the Bankruptcy Code, a chapter 11 debtor is deemed to have assumed, and is required to "immediately cure any deficit under, any commitment by the debtor to a Federal depository institutions regulatory agency (or predecessor to such agency) to

19

maintain the capital of an insured depository institution . . ." as a condition to remaining in chapter 11. See 11 U.S.C. § 365(o). To the extent the debtor fails to cure such a deficiency, the claim for such a deficiency is entitled to a ninth priority under section 507(a)(9) of the Bankruptcy Code. See 11 U.S.C. § 507(a)(9).

48.     In the FDIC-R Proof of Claim, the FDIC-R asserted an unliquidated claim to enforce the Debtors' prepetition capital maintenance commitments under section 365(o) of the Bankruptcy Code. In discussions with the Debtors, the FDIC-R has pointed to several possible bases for such a claim, including (1) a parent guaranty that was provided by PFF Bancorp to the OTS in connection with a capital restoration plan that was submitted by PFF Bank to the OTS on November 14, 2008, in accordance with the "prompt corrective action" regime of 12 U.S.C. § 1831o and regulations promulgated thereunder, (2) a Memorandum of Understanding between PFF Bancorp and the OTS dated June 13, 2008, in which PFF Bancorp agreed to "make available all available cash for its equivalent and liquid assets available for infusion into this thrift subsidiary if and as directed by the Regional Director," and (3) a stipulated order to Cease and Desist issued by the OTS to PFF Bancorp as of November 19, 2008 requiring PFF Bancorp to "make best efforts to pursue all options to obtain sufficient capital for infusion into [PFF Bank] so that [PFF Bank] shall achieve well-capitalized status as defined in 12 C.F.R. § 565.4 by December 31, 2008."

49.     The FDIC-R has also informed the Debtors that because of the parties' settlement discussions, it has not completed its investigation of these claims to, among other things, fully liquidate the amount of any deficiency under any pre-petition commitment to maintain the capital of PFF Bank or determine the amount of such a claim that would be entitled to priority under section 507(a)(9).

LEGAL_US_E # 90463238.6
RLF1 3628544v. 1

50.     Without acknowledging that any of these instruments could constitute a capital maintenance commitment under section 365(o) of the Bankruptcy Code, the Debtors have noted in discussions with the FDIC-R that under 12 U.S.C. § 1831o(e)(2)(E), the amount of PFF Bancorp's guaranty liability would have been limited to "five percent of the institution's total assets at the time the institution became undercapitalized." 12 U.S.C. § 1831 o (e)(2)(E)(I). The FDIC-R has noted that any claim related to a failure to cure a deficit for a commitment made to a regulatory agency to maintain the capital of PFF Bank would be not less than $19 million in this instance. Based on the recent decision in In re Colonial Bancorp, Inc., 436 B.R. 713 (Bankr. M.D. Ala. 2010), as well as the fact that the OTS refused to accept the capital restoration plan to which the parent guarantee was attached, the Debtors do not believe that the FDIC-R would be successful in establishing that a capital maintenance commitment existed or in asserting such a priority claim. Nevertheless, given that the FDIC-R has in fact filed an appeal of the Colonial Bank decision, the Debtors have no doubt that they would be faced with the fees and expenses associated with a contested claim objection and would be faced with further delays associated with litigating such claim objection.

51.     In addition, the claims asserted in the FDIC-R Proof of Claim include claims for recovery of dividends and other transfers paid by PFF Bank to PFF Bancorp prior to PFF Bank's failure, including dividends of $20 million during the quarter ended March 31, 2007 and of $4 million during the quarter ended June 30, 2007. If the parties' disputes were to be litigated to resolution, including the Debtors' claims for recovery of capital contributions made by PFF Bancorp to PFF Bank as alleged fraudulent transfers, the Debtors anticipate that the FDIC-R would assert that such upstream transfers should be unwound for similar reasons as those asserted by the Debtors with respect to the downstream transfers in its claims against the FDIC-

21

R. Additionally, the Debtors believe that they may also be forced to contend with other significant general unsecured claims.

52.     The Settlement Agreement also allows the Debtors to resolve the District Court Action without additional litigation. As set forth in the Settlement Agreement, the Debtors have sought judicial review of the FDIC-R's denial of the Receivership Claim. Although the Debtors would pursue such action vigorously in the absence of the Settlement Agreement, the Debtors face much uncertainty in the pursuit and collection of the Receivership Claim. Among other things, the Debtors believe that the FDIC-R and FDIC-C would assert that 12 U.S.C. § 1828(u) bars the Debtors' fraudulent transfer claims and that the receivership claims process in 12 U.S.C. § 1821(d) bars the Debtors from asserting other claims that have been asserted in the District Court Action.

53.     Additionally, given that the FDIC-R has published notice stating that there will be no funds to distribute to creditors from the receivership, even if the Debtors prevailed in the District Court Action they would expect to receive only a receivership certificate in the amount of such an allowed claim which would be unlikely to receive ratable distributions from the receivership. See Determination of Insufficient Assets To Satisfy Claims Against Financial Intuition In Receivership, 75 Fed. Reg. 45114 (notice provided July 27, 2010).

### Collection Issues

54.     The Debtors do not believe there would be any collection issues with respect to obtaining the refunds from the IRS. As noted above, the Debtors believe they would face significant collection issues with respect to the Receivership Claim even if the Debtors were able to successfully prosecute such claim in the District Court Action.

22

## Interest of Creditors

55.    Approval of the compromise is in the paramount interest of the creditors of the Debtors' estates. Pursuant to the Settlement Agreement, the Debtors will receive a substantial portion of the tax refunds, thereby increasing the pool of assets available for distribution to creditors. In addition they will avoid protracted and expensive litigation with the FDIC-R regarding the tax refunds. Given that the Debtors' estates currently consist of approximately $3 million and that a plan of reorganization can move forward on an expeditious manner if the Settlement Agreement is approved, the Debtors believe that the Settlement Agreement is in the best interests of all creditors.

56.    Further, as set forth below, the agreement set forth in the Settlement Agreement provides the Debtors with a substantially larger distribution than they might receive if they were unsuccessful in litigating the tax refund issues with the FDIC-R.

57.    The Debtors have analyzed the potential return for the bankruptcy estate based upon the following issues: (i) whether the tax refund allocable to PFF Bank is property of the bankruptcy estate; and (ii) the appropriate amount of the tax refund allocable to PFF Bank under the PFF Tax Allocation Agreement.

58.    Under the Debtor's analysis, the recovery for the FDIC-R on the tax refund could be $34 million out of an expected tax refund of approximately $44.5 million if the FDIC-R prevailed on its claims that (a) the tax refund of PFF Bank was not property of the estate; and (b) the tax refund allocable to PFF Bank was approximately $34 million.

LEGAL_US_E # 90463238.6
RLF1 3628544v. 1

59.     Additionally, under the Debtors' analysis, the potential range of recoveries for the

FDIC-R under the NOL Refunds is from approximately $13 million[4] to $47 million,[5] or the

entire potential bankruptcy estate.  To illustrate the highest range: the FDIC-R could prevail on

its claims that (a) the tax refund of PFF Bank related to the NOL Refunds was not property of the

estate, and that it was entitled to approximately $34 million of the NOL Refunds; and (b) the

FDIC-R is entitled to a priority claim of $19 million and a general unsecured claim of $24

million, however, because only $13 million would be left in the estate (after payment of $34

million to the FDIC-R for the NOL Refunds), the FDIC-R would claim priority to the remaining

$13 million ($34 million + $13 million = $47 million).

60.     Thus, the Settlement Agreement allows the Debtors to avoid litigation that could

go on for years, use up a substantial portion of the funds currently held in the Debtors' estates

and result in the Debtors receiving substantially less that the amounts they are to receive under

the Settlement Agreement.  Through the Settlement Agreement, the Debtors bring certainty to

this very complicated issue, will substantially increase the funds in the Debtors' estates and

allow the Debtors to move forward in an expeditious manner with a plan of liquidation so that

distributions can be made to creditors.

61.     Finally, although the Committee has not decide as of the date of this motion

whether it will support approval of the Settlement Agreement, the mere fact that certain creditors

---

[4]     The $13 million recovery assumes that the junior subordinated claims of Wilmington Trust will be
considered part of the pool of unsecured creditors.  This issue is not free from doubt.  If Wilmington Trust
were not considered part of the pool of unsecured creditors, the recovery for the FDIC-R would be
approximately $24.9 million.

[5]     As part of the proposed Settlement Agreement, the FDIC-R would release all claims against the Debtors
including it claims against Bancorp arising from its obligation to support its non-debtor subsidiary PFF
Bank.  The Debtors dispute the amount of this claim and that it is entitled to priority treatment, however,
the FDIC-R has continued to assert this claim and that it is not less than $19 million.   If the FDIC-R were
to prevail on this claim, it would increase the FDIC-R's recovery beyond the estimated $34 million arising
from the tax refunds.

24

may not support the approval of this motion does not render the settlement outside the range of reasonableness, particularly where, as here, the Debtors have established that the settlement satisfies the factors required by the Third Circuit. Accordingly, the Agreement is in the best interest of the Debtors' estates and their creditors and warrants approval by this Court

62. The Settlement Agreement represents the culmination of substantial arms'-length negotiation between the parties regarding the issues identified above. It is the Debtors' business judgment that entering into the Settlement Agreement is in the best interests of their estates and creditors.

63. After considering the inherent uncertainty, risks, delays, and expense associated with the full litigation of the issues identified above, the Debtors, in consultation with their advisors, determined that the potential benefits of continued litigation do not outweigh the benefits achieved by resolving these issues through settlement at this time.

### Notice

64. Notice of this Motion shall be provided to: (a) the Office of the United States Trustee for the District of Delaware, (b) counsel to the Committee, (c) counsel to the FDIC-R, (d) counsel to the FDIC-C, (e) any party who filed a proof of claim in the Bankruptcy Cases and (f) any parties requesting notice in the Bankruptcy Cases pursuant to Bankruptcy Rule 2002. In light of the nature of relief requested, the Debtors respectfully submit that no further notice of this Motion is required.

WHEREFORE, the Debtors' respectfully request that the Court enter an order, substantially in the form attached hereto as Exhibit A: (i) granting the relief requested herein and (ii) granting such other and further relief as the Court may deem proper.

LEGAL_US_E # 90463238.6
RLF1 3628544v. 1

Dated: November 12, 2010
Wilmington, Delaware

Respectfully submitted,

Paul N. Heath (DE 3704)
Chun I. Jang (DE 4790)
Andrew C. Irgens (DE 5193)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
Email: heath@rlf.com
       jang@rlf.com
       irgens@rlf.com

       -and-

Richard A. Chesley (Ill. Bar No. 6240877)
Kimberly D. Newmarch (DE 4340)
PAUL, HASTINGS, JANOFSKY & WALKER LLP
191 North Wacker Drive, 30th Floor
Chicago, Illinois 60606
Telephone: (312) 499-6000
Facsimile: (312) 499-6100
Email:    richardchesley@paulhastings.com
          kimberlynewmarch@paulhastings.com

COUNSEL FOR DEBTORS
AND DEBTORS IN POSSESSION

26